# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| JAMES SLAUGHTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 08-CV-2776 |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner | ) | Judge Joan H. Lefkow |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

James Slaughter seeks judicial review of a final decision of the Commissioner of Social Security ("the Commissioner") denying his applications for disability insurance benefits under Title II of the Social Security Act ("the Act"), 42 U.S.C. § 423(d), and supplemental security income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1382c(a)(3).  Slaughter asks the court to reverse the decision of Administrative Law Judge Helen Cropper ("the ALJ"), which found him 'not disabled' under the relevant provisions of the Act, 42 U.S.C. §§ 416(i), 423(d), 1602, 1614(a)(3)(A), and to remand this case to the Commissioner for further consideration of his claims.  The parties have filed cross-motions for summary judgment.  This court has jurisdiction over this case pursuant to 42 U.S.C. §§ 405(g) and 1383(c).  For the following reasons, the court grants the Commissioner's motion [#32], denies Slaughter's motion [#22-1], and affirms the Commissioner's decision denying disability insurance benefits and SSI.

# BACKGROUND

James Slaughter was born on June 2, 1955. He is single and lives with his sister on Chicago's South Side.[1] The highest level of education he completed successfully was the eleventh grade. Despite obtaining a commercial driver's license ("CDL") in 1999, Slaughter has never used it as a means to find employment.[2] According to a work history report submitted to the Social Security Administration ("SSA"), from March 1998 to September 2000, he worked as a truck driver for a food delivery company named Tiger Trade. This job was his most recent paid position.[3] At the May 2007 hearing, Slaughter testified that he was fired from his job at Tiger Trade in 2000 because he took too many days off work to care for his ailing mother. Slaughter tried to return to Tiger Trade in July 2001, but he was not rehired. No earnings have been reported on his Social Security records since 2000. Slaughter has not actively searched for permanent employment since the onset of his medical problems in 2002. Occasionally, Slaughter performs certain odd jobs for friends and acquaintances, but the paltry cash payments received from such work have never provided him with enough money to live independently. Since 2004, his only consistent source of income has been welfare benefits in the form of a LINK card and small welfare grant each month.[4] His sister works for the City of Chicago, and she is Slaughter's only nongovernmental source of financial support.

---

[1] According to the May 1, 2007 ALJ hearing, Slaughter and his sister live in the same house in which their parents lived. Slaughter was married during the 1980s, but according to his testimony he and his wife divorced in 1989. He fathered three children during his marriage, all of whom are grown. Except for the period in the 1980s when he was married, Slaughter has lived in his parents' home for all of his adult life.

[2] Slaughter testified that he renewed his CDL on his 50th birthday, June 2, 2005.

[3] Prior to his job at Tiger Trade, Slaughter worked sporadically at a variety of unskilled positions, including truck driver, warehouse employee, chemical mixer, and courier.

[4] At the May 1, 2007 hearing, Slaughter testified that his welfare grant each month is $100.

Slaughter claims to suffer from a variety of medical problems, which form the basis for his applications for disability benefits and SSI. Beginning in November 2002, Slaughter started to complain of pain in his testicular area. His doctors determined that the discomfort derived from a hydrocele—a benign cyst in his scrotum—and in April 2003 he underwent successful surgery to remove the hydrocele. After the surgery, Slaughter had four follow-up medical appointments to monitor the status of his recovery. Except for complaints of erectile dysfunction (for which his doctors prescribed Viagra) and occasional pain with heavy lifting, the record shows that Slaughter recovered well. His last documented treatment for the hydrocele recovery occurred on August 18, 2003, and his physician prescribed an antibiotic and 600 mg of ibuprofen. Slaughter has not complained of any medical ailments related to the hydrocele operation, and he experienced no residual limitations from the hydrocele.[5] Although Slaughter made frequent medical visits immediately before and after the operation, excluding that three-week period, Slaughter has sought medical attention, on average, less than once per month from February 2003 to May 2007.[6]

In March 2004, Slaughter began to complain of intermittent fainting spells, headaches, and occasional lightheadedness. The precise cause of the fainting spells was never determined by treating physicians, but the record indicates that these mysterious episodes had vanished by 2005.[7] Diagnostic studies and neurological treatment led his doctors to rule out a seizure

---

[5] Due to the voluminous record in this case, this opinion only provides a synopsis of the most material facts relating to Slaughter's medical problems. For a more detailed summary of the medical evidence amassed during the first round of litigation, see *Slaughter* v. *Barnhart*, No. 05-C-5988, 2006 WL 2506215 (N.D. Ill. July 21, 2006).

[6] According to review of the record, Slaughter had six treatment visits between February 20 and August 18, 2003, with three of the visits occurring between April 25 and May 8. During 2004, he had eight medical visits and sometimes saw more than one provider at the same facility on the same date. He had five treatment visits in 2005; seven in 2006; and three in 2007. *See* AR 297.

[7] The record is not entirely clear on the frequency or totality of Slaughter's fainting spells. During an ER visit at Stroger Hospital on March 22, 2004, Slaughter reported three recent episodes of fainting. During

3

disorder and other severe impairments as the cause of these fainting episodes. According to the record, Slaughter has not complained of any recurrence of these spells since early 2004.

The most substantial changes in Slaughter's medical condition since 2005 concern his complaints of right-shoulder pain and abnormal sensations of numbness in his left arm and leg. Between June 2005 and April 2007, Slaughter was examined by multiple physicians who evaluated the range-of-motion problems in his arms and prescribed over-the-counter ibuprofen for pain management. Slaughter's complaints and clinical exam results were not consistent over time. Although one radiologist opined that Slaughter was experiencing "degenerative osteoarthritic changes," particularly in his right shoulder, AR 470, other medical tests evaluating Slaughter's orthopedic and neurological functions were essentially normal and ruled out serious impairments that might have contributed to his symptoms.[8] Objective medical evidence also did not establish a medically determinable impairment that would limit significantly Slaughter's ability to stand or walk. Neurological testing failed to pinpoint a definitive physiological explanation for the left-sided numbness, and Slaughter's treating neurologist described the test results of an August 2006 MRI as "normal."[9] AR 550. Despite complaining of ongoing

---

an appointment at the Roseland Board of Health on June 28, 2004, he reported experiencing fainting spells since the "first part of 2004," but did not elaborate on the frequency of the spells. And finally, at an appointment with Fantus neurology clinic on September 30, 2004, Slaughter reported that he had "three episodes of fainting" since June 2003. The relative infrequency of fainting spells led the ALJ to conclude that whatever the frequency of the spells, they did not constitute a "severe impairment" under 20 C.F.R. §§ 404.1521, 416.921. AR 276-77.

[8] Throughout his treatment, Slaughter was examined by his primary physician, Dr. Delgado, state physician Dr. Gaziano, and by physicians at the Fantus neurology clinic. No doctor who either personally examined Slaughter or reviewed his medical condition (e.g., state physician Dr. Jimenez) ever diagnosed him with any severe impairment. At worst, the medical tests were consistent with slight arthritis in his right shoulder.

[9] Slaughter's treating neurologist, Dr. Singleton, also ordered a diagnostic test to determine whether he had carpal tunnel syndrome ("CTS"). Slaughter, however, could not tolerate the test, and no doctor has opined that he is constrained in his ability to use his hands for fine gross manipulation of objects. Although a treating medical student reported a positive Phalen's sign during examination, which could be diagnostic of CTS, no diagnosis of CTS was ever made. Slaughter's testimony and clinical exams made

numbness and shoulder pain between 2005 and 2007, Slaughter's prescription records show that he only filled *three* prescriptions for ibuprofen pain medication between April 2005 and April 2007.[10]

Additionally, Slaughter has been treated for hypertension and high cholesterol, which stem partly from his mild obesity.[11]  Slaughter's physicians have prescribed hydrochlorothiazide (HCTZ), Lipitor and Norvasc to control his elevated blood pressure and cholesterol levels. Medical records reveal that his blood pressure has remained at a normal and relatively stable level since 2005.  Despite Slaughter's obesity, he has no documented period of ineffective ambulation.  Nor does he allege any other significant limitations caused by or related to the obesity.

Finally, the record indicates that Slaughter has had problems with alcohol abuse. Slaughter has candidly acknowledged his frequent alcohol consumption, although he denies he has a drinking problem.  During a consultative psychiatric examination in February 2007, Dr. Ana Gil wrote that Slaughter reported he typically drank beer three times a week and a pint of hard liquor every two months.  Given Slaughter's history of consistent alcohol use, which included blackouts, delirium tremens, a D.U.I., a brief stint in jail for domestic violence, and the fact that his longest consecutive period of full sobriety was only two months, Dr. Gil diagnosed

---

it clear that he did have the type of "sustained disturbance of gross and dexterous movements" of both hands required to satisfy 20 C.F.R. Part 404, Subpart P, Appendix 1, § 11.14, which is typically used to evaluate CTS.  AR 278.

[10] Slaughter first filled a prescription for 20 tablets of 600 mg Motrin on April 26, 2005.  On October 27, 2006—*17 months later*—he filled a prescription for 60 tablets of 600 mg Motrin.  The record indicates that the last time he filled a prescription for pain medication was on January 23, 2007 when he got another 60 tablets of 600 mg Motrin.

[11] With a height of approximately 73 inches and a weight that has fluctuated from 238 lbs. to 248 lbs., claimant's body mass index ("BMI") ranges from 31 to 33.  This range places him in the Level 1 category of mild obesity, as established by the Clinical Guidelines on the Identification, Evaluation, and Treatment of Overweight and Obesity in Adults.

alcohol dependence and abuse in early remission. She also noted that Slaughter had virtually no insight into his drinking habits. Slaughter testified that his ability to function on a daily basis is not affected by his moderate and habitual alcohol consumption. Taking Slaughter's entire medical record from 2003 to 2007 into consideration, the ALJ ruled that Slaughter has no impairment (physical or mental) or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

The procedural posture of this case spans several years. Slaughter filed his concurrent applications for disability insurance benefits and SSI for the first time on March 28, 2003. Slaughter identifies December 31, 2000 as the alleged onset date ("AOD") of his disability, and he identifies his date last insured ("DLI") as December 31, 2002.[12] On June 25, 2003, the Commissioner denied Slaughter's applications, and on August 19, 2003, the applications were denied again on reconsideration. The ALJ held a hearing on Slaughter's claims on June 28, 2005. During the hearing, Slaughter represented himself. On July 7, 2005, the ALJ issued a ruling upholding the Commissioner's denial of Title II benefits and Title XVI SSI. After the unfavorable decision, Slaughter filed a request for review with the Appeals Council. The Appeals Council denied Slaughter's request on August 18, 2005, thus making the ALJ's denial the final decision of the Commissioner. 20 C.F.R. § 405.372.

Slaughter filed this action on December 28, 2005. Citing chiefly Slaughter's lack of legal representation and the insufficient amount of time the ALJ had to review his medical files before the June 28, 2005 hearing, Judge James B. Moran of this court remanded the case for more

---

[12] To be eligible for Title II benefits, Slaughter must establish that he satisfied the statutory requirements for disabled status on or before his DLI. *See* 20 C.F.R. § 404.130. To qualify for Title XVI supplemental income, however, Slaughter need only establish that he was disabled prior to the date on which the ALJ rendered her decision—in this case, October 9, 2007. *See* 42 U.S.C. § 1382(a)(1) (listing eligibility requirements for Title XVI supplemental income).

extensive development of the record.  *Slaughter* v. *Barnhart*, No. 05-C-5988, 2006 WL 2506215

(N.D. Ill. July 21, 2006).  On August 4, 2006, Slaughter filed another set of applications for

benefits.  These applications were consolidated and adjudicated with the remanded claims.

After the remand, the ALJ obtained and reviewed all medical records relevant to

Slaughter's alleged disability claims.  On May 1, 2007, she held a second hearing on Slaughter's

claims, during which Slaughter was represented by legal counsel.  Based on the more fully

developed record, which included a substantial amount of medical evidence that was not before

the ALJ in 2005, the ALJ issued another unfavorable decision on October 9, 2007.  On April 19,

2008, the Appeals Council denied Slaughter's request for review of this most recent decision,

leaving the ALJ's October 9, 2007 opinion the final ruling of the Commissioner.  For the second

time, Slaughter has appealed the Commissioner's final ruling to this court, pursuant to 42 U.S.C.

§§ 405(g), 1383(c)(3).

## LEGAL STANDARD

The administrative law judge's opinion on a claimant's disability must be upheld if it is

supported by substantial evidence on the record as a whole.  *Walker* v. *Bowen*, 834 F.2d 635, 639

(7th Cir. 1987) (quoting *Smith* v. *Schweiker,* 735 F.2d 267, 270 (7th Cir. 1984)).[13]  "Substantial

evidence" has been defined as "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion."  *Aidinovski* v. *Apfel*, 27 F. Supp. 2d 1097, 1101 (N.D. Ill.

1998) (quoting *Richardson* v. *Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842

(1971)).  The court may not reweigh the evidence.  *Walker*, 834 F.2d at 640.  "Where conflicting

evidence allows reasonable minds to differ as to whether a claimant is disabled, the

---

[13] The Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported
by substantial evidence, shall be conclusive[.]"  42 U.S.C. § 405(g).

responsibility for that decision falls on the Secretary[14] (or the Secretary's designee, the ALJ)." *Id.* (citing, *inter alia*, *Delgado* v. *Bowen*, 782 F.2d 79, 82-83 (7th Cir. 1986)).  "Therefore, the question presented for review is not whether [the claimant] is disabled, but only whether the ALJ's finding of non-disability is supported by substantial evidence in the record."  *Walker*, 834 F.2d at 640.  Finally, the ALJ must articulate her assessment of the evidence and the basis for her conclusion in order to "build an accurate and logical bridge from the evidence to the conclusion."  *Giles ex rel. Giles* v. *Astrue*, 483 F.3d 483, 487-88 (7th Cir. 2007) (citing *Scott* v. *Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002)).  Without such an explanation, the courts cannot undertake any meaningful review and should remand the case.  *Giles*, 483 F.3d at 487; *Steele* v. *Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

## ANALYSIS

Social Security Regulations prescribe a sequential five-part test for determining whether a claimant is disabled.  20 C.F.R. §§ 416.920, 404.1520; *Woods* v. *Barnhart*, No. 02-C-4893, 2004 WL 769380, at *6 (N.D. Ill. April 9, 2004).  Under this test the Commissioner must consider the following: (1) whether the claimant has performed substantial gainful activity during the period for which he claims disability; (2) if he has not performed any substantial gainful activity, whether the claimant has a severe impairment or combination of impairments; (3) if the claimant has a severe impairment, whether the claimant's impairment meets or equals any impairment listed in the Regulations as being so severe as to preclude substantial gainful activity; (4) if the impairment does not meet or equal a listed impairment, whether the claimant retains the residual functioning capacity ("RFC"), despite his impairment, to perform his past relevant work; and (5) if the claimant cannot perform his past relevant work, whether the

---

[14] That is, the responsibility rests with the Commissioner.

claimant is able to perform any other work existing in significant numbers in the national economy, considering his RFC together with age, education, and work experience. 20 C.F.R. §§ 416.920, 404.1520; *see also White* v. *Barnhart*, 415 F.3d 654, 657 (7th Cir. 2005); *Young* v. *Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). The claimant bears the burden of proof at steps one through four, while the burden shifts to the Commissioner at step five. *Young*, 957 F.2d at 389. This process is sequential, and if at any step the ALJ can make a conclusive finding that the claimant either is or is not disabled, the inquiry ends and the ALJ need not continue. *Young* v. *Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

The ALJ applied each step of the sequential analysis before finding that Slaughter was not disabled under the Regulations. First, the record did not establish that Slaughter had engaged in disqualifying substantial gainful activity since December 31, 2000, the alleged onset date. No wages are reported on his Social Security earnings record after 2000. Secondly, the ALJ found that Slaughter's mild obesity has been a severe impairment throughout the relevant period. She also noted that Slaughter's complaints of right shoulder pain and abnormal sensations on his left side did not impose significant functional limitations on his ability to perform work within his RFC, as long as he takes prescribed medications. At step three, the ALJ concluded that Slaughter's impairments, taken collectively, did not satisfy the conditions for any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.[15] At step four, the ALJ determined that although Slaughter lacked the RFC to perform any past relevant work, such as truck driving, he still retained the RFC to perform most light work. Finally, on the basis of the medical evidence and the testimony of Slaughter and the vocational expert at the hearing, the ALJ

---

[15] If the answer to this inquiry had been yes, Slaughter would have been *per se* disabled under the Regulations and thus entitled to benefits.

concluded at step five that the Commissioner had proved Slaughter was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy." AR 297.

## I.      ALJ's alleged failure to explain assessment of Slaughter's RFC

First, the court must address an issue pertaining to step four of the five-step inquiry. Specifically, Slaughter argues that the ALJ failed to explain her assessment of Slaughter's RFC. Slaughter's RFC is the ability to do physical or mental work activities on a sustained basis despite limitations or impairments. 20 C.F.R. §§ 404.1545. The ALJ assesses the claimant's RFC based on all of the relevant medical evidence, including medical source opinions and all allegations of physical and mental limitations. *Id.*; SSR 96-8p.

Slaughter's argument disputing the sufficiency of the ALJ's RFC determination is without merit. Contrary to his allegations, the ALJ's analysis of Slaughter's RFC expressly considered all of his reported symptoms, the objective medical evidence, and the opinion evidence contained in the record. *See* AR 279-93. Indeed, it is difficult to imagine how the ALJ's RFC analysis could have been more comprehensive. She devotes fifteen pages of her 27-page ruling to summarizing the voluminous medical evidence relevant to her RFC assessment, and in doing so she chronologically traces the development of Slaughter's alleged impairments over a four-year period. The ALJ's meticulous recounting of the record, along with her contemporaneous evaluation of the medical evidence as a whole, satisfies her duty to provide the "logical bridge" between the evidence and her conclusion. *Getch* v. *Astrue*, 539 F.3d 473, 480 (7th Cir. 2008). No basis exists for disturbing the RFC finding.

## II.     ALJ's alleged failure to properly analyze physicians' opinions

Slaughter also challenges the sufficiency of the ALJ's analysis of the medical opinion

evidence in the record.  Initially, he argues that the ALJ failed to properly analyze the opinion evidence of certain treating and examining physicians, specifically Dr. Dominic Gaziano and Dr. Singleton, whose medical findings allegedly advance Slaughter's argument that he is disabled.

Dr. Gaziano conducted a consultative examination of Slaughter on October 9, 2006, for purposes of supplying information relevant to Slaughter's disability applications.  Page 13 of the ALJ's ruling forecloses any argument that the ALJ failed to consider this opinion, as the ALJ expressly discussed Dr. Gaziano's report from the October 9 exam, and analyzed it closely in the context of responding to arguments advanced by Slaughter's attorney.  *See* AR 284 ("I believe [Slaughter's attorney] misconstrues Dr. Gaziano's comment [in his report] as suggesting that the doctor was diagnosing a current alcohol problem, as opposed to current limitations that might have been caused by a remote history of more significant alcohol use. . . . I do not read Dr. Gaziano's report to diagnose current alcohol dependence or abuse.").  Slaughter also takes issue with the ALJ's failure to analyze the alleged consistency of Dr. Gaziano's opinion and the opinion of his treating neurologist, Dr. Singleton.  This argument, however, also falls short. Slaughter contends that the ALJ should have compared two pieces of evidence that are essentially incomparable.  The ALJ did not compare Dr. Gaziano's report and Dr. Singleton's opinion for two reasons: (1) the nature of the two physicians' respective inquiries fundamentally differed in type, and (2) the physicians conducted their examinations for different purposes.  Dr. Gaziano merely examined Slaughter and reported data, while Dr. Singleton composed an RFC assessment.  Dr. Gaziano never expressed an opinion as to Slaughter's exertional capacity, and thus Slaughter's characterization of Gaziano's report as a "functional capacity assessment," *see* Pl.'s Brief at 13, is simply false.  Dr. Gaziano's sole purpose in examining Slaughter was to "supply[] information relevant to the listings criteria of the Social Security Disability program."

AR 464.  Dr. Gaziano merely reported the findings gleaned from a brief, 38-minute exam with Slaughter, and these findings served as the basis for a true RFC assessment conducted by Dr. Frank Jimenez on October 20, 2006.  Dr. Jimenez's RFC assessment included a verbatim summary of Dr. Gaziano's findings, and he opined that the record did not establish Slaughter's disabled status.[16]  It is unclear whether Slaughter misunderstood the nature of Dr. Gaziano's examination, or whether he is attempting to draw the court's attention to medical evidence that reflected favorably on Slaughter's claim when viewed only in isolation.[17]  The seemingly favorable evidence that Slaughter has cherry-picked in support of his motion does not tell the whole story.

Even assuming, *arguendo*, that Dr. Gaziano's report provides support for Slaughter's case, the ALJ committed no error in devoting only one page of her opinion to this piece of evidence.  The Regulations distinguish a "treating" physician, *i.e.*, a personal doctor with whom the patient has an ongoing relationship, from a "nontreating" physician, *i.e.*, a doctor who has examined the patient but does not have an ongoing relationship.  20 C.F.R. § 404.1502.  Dr. Gaziano, in his capacity as a consultative examiner for the State, was a nontreating physician.  *Id*.  Unlike treating physicians, whose opinions are presumptively entitled to controlling weight, *see* 20 C.F.R. § 404.1527(d); SSR 96-2p, the opinions of nontreating physicians receive no such deference.  Dr. Gaziano, moreover, only examined Slaughter once for a short period of time—a *mere 38 minutes*.  Considering the voluminous evidence in this case, Dr. Gaziano's nontreating status, and the doctor's lone, brief encounter with Slaughter, the court finds that the ALJ's

---

[16] Dr. Jimenez also made the following conclusions: (1) Slaughter could perform most work at the medium exertional level; (2) he had a reduced ability to push and/or pull with the right upper extremity; (3) he should not work on moving or unstable surfaces; (4) he should only climb occasionally; and (5) he can only occasionally lift or reach above 90 degrees with the right upper extremity.  AR 456-63.

[17] Another physician, Dr. Kim, reviewed Slaughter's condition in January 2007 and concurred with Dr. Jimenez's RFC assessment.  *See* AR 450-52.

analysis of Dr. Gaziano's consultative report was sufficient.

Slaughter also argues that the ALJ erred in not articulating the weight she afforded Dr. Singleton's May 15, 2007, RFC assessment. Unlike Dr. Gaziano, Dr. Singleton was one of claimant's treating physicians, and therefore subject to the so-called "treating source" rule. The treating-source rule "directs the administrative law judge to give controlling weight to the medical opinion of a treating physician if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence.'" *Hofslien* v. *Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006) (quoting 20 C.F.R. § 404.1527(d)(2)). The presumption affording controlling weight to a treating source's opinion can be rebutted "once well-supported contradicting evidence is introduced." *Id.*

This is not to say, however, that the ALJ can immediately reject the treating physician's opinion outright due to the contradictory evidence. Rather, "a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case" means only that the opinion is not entitled to "controlling weight." SSR 96-2p. At that point, the presumption drops out and "the treating physician's evidence is just one more piece of evidence for the [ALJ] to weigh." *Hofslien*, 493 F.3d at 377; *see also Bauer* v. *Astrue*, 532 F.3d 606, 608 (7th Cir. 2008). The Regulations establishing the treating-source rule provide various factors that the ALJ should consider to help her decide how much weight to give the treating source's opinion. 20 C.F.R. § 404.1527(d)(2)-(6); *see* SSR 96-2p ("[T]he . . . decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record[.]"). In the event an ALJ finds a treating source's opinion not controlling, the ALJ must

still explain the weight given to the treating source's opinion. Failure to do so is grounds for reversal. *See Moss* v. *Astrue*, 555 F.3d 556, 560-61 (7th Cir. 2009).

Slaughter takes no issue with the ALJ's decision not to give controlling weight to Dr. Singleton's opinion. Instead, he argues that the ALJ failed to specify *what weight, if any*, she gave to Dr. Singleton's opinion. "An ALJ may discount a treating physician's medical opinion if it is inconsistent with the opinion of a consulting physician, or when the treating physician's opinion is internally inconsistent," *Skarbek* v. *Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004), as long as she "minimally articulates [her] reasons for crediting or rejecting evidence of disability." *Clifford* v. *Apfel*, 227 F.3d 863, 870 (7th Cir. 2000). Ultimately, "it is up to the ALJ to decide which doctor to believe," a determination "subject only to the requirement that the ALJ's decision be supported by substantial evidence." *Books* v. *Chater*, 91 F.3d 972, 979 (7th Cir. 1996). Nothing mandates that the opinion of a treating physician always be accepted over the opinion of a consulting physician. *See id.*

Slaughter's challenge is foreclosed by the ALJ's careful analysis and comparison of the mobility assessments and progress notes offered by physicians who reviewed his medical condition in 2006 and 2007. *See* AR 287-88. The ALJ found that Dr. Singleton's diagnosis of Slaughter with greatly reduced mobility and extreme range-of-motion limitations was contradicted by the opinion of a nonexamining, consultative physician (Dr. Jimenez) and by Dr. Singleton's own contemporaneous progress notes. *See* AR 287-88 (comparing Dr. Jimenez's RFC assessment to Dr. Singleton's RFC assessment); *id.* at 288 ("Dr. Singleton's opinions about claimant's markedly limited ability to lift, sit, stand and/or walk appear to be contradicted several times in the contemporaneous progress notes from the neurology clinic . . . including at the April 24[, 2007] visit, [Slaughter's] last documented visit in the neurology clinic before Dr.

Singleton completed the impairment form."). Moreover, the ALJ noted that Dr. Singleton's RFC appraisal did not appear to be consistent with diagnostic testing results, other medical advice that Slaughter should have a more active lifestyle,[18] or Slaughter's professed ability to walk frequently for exercise. *Id.* at 288 ("I . . . cannot find in the contemporaneous progress notes or reports of diagnostic studies an explanation for Dr. Singleton's opinion that [Slaughter] is unable to sit through a normal work day, with typical breaks."). This contradictory evidence constituted sufficient 'substantial evidence' for the ALJ's decision not to give Dr. Singleton's opinion controlling weight. Accordingly, Dr. Singleton's evidence constituted "just one more piece of evidence" for the ALJ to weigh. *Bauer*, 532 F.3d at 608.

In determining what weight to give Dr. Singleton's opinion, the ALJ properly applied the factors listed in the relevant paragraphs of the Regulations. *See* 20 C.F.R. § 404.1527(d)(2)-(6). "If the ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Moss*, 555 F.3d at 560. This is precisely what the ALJ did. First, she noted that Slaughter had only four documented visits with Dr. Singleton at the Fantus neurology clinic from February 2006 to April 2007, with an 11-month gap between his first and second appointments. AR 287-88. In addition to these sporadic visits, the ALJ noted that Slaughter apparently was personally examined *only once* by Dr. Singleton.[19] *Id.* at

---

[18] Dr. Delgado (claimant's primary physician) and a dietitian at the Chicago Board of Health "both encouraged [Slaughter] to increase his level of activity, and [Slaughter] typically reported to them, and testified, that he tries to walk for exercise, and is able to walk several blocks without significant problems." AR 288.

[19] Although the Commissioner does not make this argument, Dr. Singleton's extremely limited exposure to Slaughter during the relevant time period should probably disqualify his status as a 'treating source,' which would provide yet another reason to give little or no deference to his opinion. *See White* v. *Barnhart*, 415 F.3d 654, 658 (7th Cir. 2005) (finding that doctor who examined claimant only once

15

288.  Except for claimant's January 2, 2007 appointment with Dr. Singleton, during each of the other three appointments at Fantus he was examined primarily by medical students who were under Dr. Singleton's supervision.  *Id.* at 287-88.  On these occasions, Dr. Singleton merely reviewed the students' assessments instead of performing an independent examination himself.

As mentioned above, the ALJ critically evaluated *Dr. Singleton's RFC assessment* and found that his opinion lacked evidentiary support and was inconsistent with *Dr. Singleton's contemporaneous treatment notes* and the opinions of other doctors.  It is also clear that the ALJ took Dr. Singleton's specialization as a neurologist into consideration.  She noted that tests conducted at Fantus ruled out serious neurological impairments as the cause of Slaughter's numbness and range-of-motion problems.  The parts of Dr. Singleton's opinion that the ALJ was skeptical of have nothing to do with Dr. Singleton's specialization as a neurologist.  Rather, the ALJ discounted those parts of Dr. Singleton's opinion bearing on Slaughter's musculoskeletal limitations, *e.g.*, how long he could sit, how far he could reach, *etc*.  It is one thing for a neurologist to say that a patient's range-of-motion problems do not derive from neurological causes—a conclusion that falls well within a neurologist's specialization.  It is quite another thing to say that a *neurologist's* opinion on a *musculoskeletal* diagnosis—the specialty of an orthopedist—should receive great weight when the record contains substantial evidence contradicting the neurologist's opinion on this front.  It is unclear how Dr. Singleton's specialization as a neurologist would make his dire assessment of claimant's orthopedic condition more authoritative or deserving of more deference than the other doctors who opined on Slaughter's condition.  The ALJ articulated a reasonable basis for giving Dr. Singleton's RFC assessment very little weight and for concluding that Dr. Singleton's opinion on Slaughter's

should be classified as a 'nontreating source').

condition deserved no deference. *See Hofslien*, 439 F.3d at 377 ("[T]he weight properly to be given to testimony or other evidence of a treating physician depends on the circumstances.").

In sum, the ALJ's decision shows that she adequately articulated her reasons for giving little weight to Dr. Singleton's RFC assessment.[20] Instead of summarily dismissing Dr. Singleton's opinion, the ALJ carefully applied the § 404.1527(d) factors and provided a sound basis for declining to give great weight to his opinion. Her ruling was thus "sufficiently specific to make clear to any subsequent reviewers the weight [she] gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p. The Regulations require nothing more.

### III. ALJ's alleged failure to analyze Slaughter's range-of-motion limitations

Slaughter contends that the ALJ erred because she failed to properly analyze his shoulder range-of-motion limitations. Where the decision of the Commissioner "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele* v. *Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Hence, the ALJ "must evaluate the record fairly." *Golembiewski* v. *Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003). In doing so, the ALJ "need not discuss every piece of evidence in the record," *Dixon* v. *Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001), but at the same time the ALJ "may not ignore an entire line of evidence that is contrary to the ruling[.]" *Golembiewski*, 322 F.3d at 917 (citing *Zurawski* v. *Halter*, 245 F.3d 881, 888 (7th Cir. 2001)). If the ALJ fails to analyze a contradictory line of evidence, it is

---

[20] Slaughter seemingly argues that the ALJ failed to articulate the specific weight she afforded Dr. Singleton's opinion because her ruling contains no language explicitly stating what weight she gave it, *i.e.*, "I give Dr. Singleton's opinion little weight because . . . ." But claimant's argument misses the mark. Analysis of the ALJ's opinion leads to the inescapable inference that she gave Dr. Singleton's medical opinion very little weight based on her application of the factors listed in 20 C.F.R. § 404.1527(d). The Regulations do not require a direct, categorical statement of the weight afforded an opinion. Rather, the ALJ's duty is fulfilled by applying the § 404.1527(d) factors so that the reviewing court can trace the ALJ's reasons for "crediting or rejecting evidence of disability." *Clifford*, 227 F.3d at 871.

impossible for the reviewing court to determine whether the ALJ's decision rests upon substantial evidence. *Smith* v. *Apfel*, 231 F.3d 433, 438 (7th Cir. 2000).

Based on her review of the medical evidence, the ALJ concluded that Slaughter could not do "constant repetitive lifting or reaching overhead." AR 279. Slaughter argues, however, that the ALJ should have come to a more extreme conclusion: that claimant could *never* reach overhead with his right arm and had limited reaching ability with his left arm. He insists that although the medical evidence (allegedly) shows that he could never reach overhead with his right hand, the ALJ's finding implies that he could reach overhead on a *less than constant*, *i.e.*, occasional basis—a conclusion he deems "illogical." As the record shows, however, this allegation does not withstand scrutiny.

The record contains sufficient evidence to support the ALJ's conclusion that claimant was limited, but not entirely precluded from, working overhead. Slaughter's brief selectively quotes from Dr. Gaziano's medical report and Dr. Singleton's RFC assessment as evidence of Slaughter's extreme reaching limitations. Slaughter ignores, however, the RFC assessment of a state agency doctor, Dr. Jimenez, in which he concluded that Slaughter could occasionally lift or reach above 90° with his right upper extremity. As discussed earlier in this opinion, Dr. Gaziano did not opine on Slaughter's range-of-motion limitations; he merely recorded his physical findings and submitted them to Dr. Jimenez. And given that the ALJ provided a reasoned basis for giving little weight to Dr. Singleton's opinion, *see supra* pp. 11-16, it was reasonable for the ALJ to base her factual findings on the RFC assessment of a nonexamining state physician.

Additionally, no physician who opined on Slaughter's medical condition ever concluded that he could *never* reach or lift overhead. In this respect, Slaughter's reliance on *Golembiewski* is not helpful. In *Golembiewski*, the Court of Appeals remanded because the ALJ's decision

contained no discussion of conflicting medical evidence regarding the claimant's ability to bend with his back. One doctor reported that the claimant could barely bend his back forward, while another opined that he could bend at the waist for up to a third of an eight-hour day. Even though Golembiewski's ability to bend was material to his disability claim, the ALJ simply ignored the issue and declined to discuss the conflicting assessments. 322 F.3d at 917. In this case, however, the ALJ thoroughly considered all the pertinent record evidence bearing on Slaughter's alleged range-of-motion limitations. Most significantly, she provided a cogent rationale for accepting one medical opinion (Dr. Jimenez's) over another (Dr. Singleton's), and she based her assessment of Slaughter's work capabilities on evidence in the record. *See* AR 279-88. In sum, the ALJ reasonably concluded that Slaughter could not constantly lift or reach overhead, and the court finds no reason to disturb this finding.

## IV.    ALJ's alleged mischaracterization of the evidence

Slaughter's next contention is that the ALJ improperly mischaracterized evidence of brain abnormalities, shoulder impairments, and carpal tunnel syndrome ("CTS") that was favorable to his disability claim. In making these allegations, Slaughter curiously focuses on the section of the ALJ's opinion that analyzed his claim within the context of the Listing of Impairments at the third step of the sequential analysis. In doing so, he fails to discuss later portions of the opinion where the ALJ analyzed the medical evidence more thoroughly—specifically, in the context of whether Slaughter qualified as disabled *despite* not suffering from an impairment listed under 20 C.F.R. Part 404, Subpart P, Appendix 1.

Review of these later portions of the ruling reveals that it is Slaughter, not the ALJ, who mischaracterizes the relevant evidence. First, Slaughter argues that the ALJ mischaracterized brain studies as yielding normal results. He provides a layman's interpretation of the brain

19

studies and submits that the results were abnormal. Aside from the fact that lawyers are not qualified to make medical diagnoses, his argument goes against the weight of the evidence. As the ALJ noted, the results of an August 2006 MRI scan ruled out lesions, hemorrhage, or abnormal fluid collection. Moreover, the ALJ noted that neurologists who treated Slaughter at the Fantus neurology clinic reviewed this MRI report and subsequently described it as "normal." There is nothing in the ALJ's decision to indicate that she mischaracterized evidence about brain studies conducted on Slaughter.

Slaughter also argues that the ALJ mischaracterized his shoulder impairments. Like the analysis of the brain results, the portion of Slaughter's brief that addresses this issue points to isolated sections of the ALJ's step-three analysis and ignores the detailed analysis of the shoulder impairments appearing later in the opinion. At step three of the ALJ's analysis, however, the sole question was whether Slaughter suffered from any impairment listed under 20 C.F.R. Part 404, Subpart P, Appendix 1. Thus, the section of the opinion that Slaughter cites only addresses his shoulder limitations insofar as they bear on whether he satisfies the requirements for a condition included in the Listing of Impairments. Under *Maggard* v. *Apfel*, 167 F.3d 376, 380 (7th Cir. 1999), Slaughter bears the burden of proving that he exhibits all the necessary requirements for a listed impairment, and he does not argue that he met the requirements for any condition in the Listings. Review of the entire 27-page opinion reveals that the ALJ extensively analyzed Slaughter's shoulder impairments and at no point mischaracterized evidence of these impairments.

Finally, Slaughter's argument that the ALJ mischaracterized evidence of CTS fails for identical reasons. Again, he focuses on the ALJ's step-three analysis, but he never challenges the ALJ's finding that he failed to meet the requisite requirements for CTS in the Listing of

Impairments.  Moreover, the ALJ discussed claimant's symptoms while assessing his RFC, and there is nothing to indicate that she mischaracterized the evidence contained in the record.

**V.      ALJ allegedly accepted vocational expert testimony that was inconsistent with the**
**        *Dictionary of Occupational Titles*, without requiring explanation**

Slaughter's final contention is that the ALJ erred by accepting vocational expert ("VE") testimony that was inconsistent with the *Dictionary of Occupational Titles* ("DOT") without requiring explanation from the expert.  Under Social Security Ruling 00-4p, the ALJ has an "affirmative responsibility" to inquire whether a vocational expert's evidence "conflicts with information provided in the DOT" before she relies on that evidence to support a finding of nondisability.  *Overman* v. *Astrue*, 546 F.3d 456, 462-63 (7th Cir. 2008).  Additionally, if evidence appears to conflict with the DOT, Social Security Ruling 00-4p requires the ALJ to obtain "a reasonable explanation for the apparent conflict."  *Id.* at 463.  Failure to raise an objection under Social Security Ruling 00-4p at the ALJ hearing does not foreclose making the argument later on appeal.  *See Prochaska* v. *Barnhart*, 454 F.3d 731, 735 (7th Cir. 2006).  Yet because Slaughter failed to raise the alleged conflict at the hearing, on appeal he must additionally show that the conflicts "were obvious enough that the ALJ should have picked up on them without any assistance."  *Overman*, 546 F.3d at 463.  This is because Social Security Ruling 00-4p places a duty on the ALJ to investigate and resolve only *apparent* conflicts between the VE's evidence and the DOT.  *Id.*  Therefore, if the conflict is not apparent, and a claimant does not challenge the VE's testimony at the hearing, the ALJ's duty to investigate is not triggered.

At the first hearing on Slaughter's applications, held on June 28, 2005, the VE identified occupations that exist in significant numbers in the regional economy that a hypothetical person such as Slaughter could perform and sustain, all within his RFC: packer, assembler, visual inspector, and machine tender. The VE testified that within Slaughter's RFC, there are "more than 2000" light positions for each occupation in the region. AR 296. Additionally, he testified that additional jobs exist in the packer, assembler, and visual inspector occupations at the sedentary level and that 2500 to 3500 position exist for each cited occupation at the sedentary level.

The VE testimony at the remand hearing on May 1, 2007, which coincidentally came from the same expert who testified at the first hearing, noted little change in Slaughter's ability to perform the same light occupations he cited two years earlier. Due to the new limitations in Slaughter's ability to push or pull against resistance with his lower extremities and to lift or reach overhead with his upper extremities, the VE testified that the number of positions for each occupation would be reduced approximately 15 percent from the previously cited numbers. During his testimony, the VE was questioned by the ALJ as well as by Slaughter's counsel. The ALJ's hypotheticals incorporated the limitations she established in her specific RFC findings, which included her assessment of Slaughter's credibility. The hypotheticals offered by Slaughter's counsel, however, added several additional limitations that presented Slaughter's condition as being more severe than indicated by the objective medical evidence and other evidence.[21] Relying and accepting "only that part of the testimony of the [VE] that incorporated

---

[21] For instance, Slaughter's counsel asked the VE to consider the available occupations for a hypothetical worker who could not push or pull any weight with either upper or lower extremity—even objects as light as a sheet of paper or a file folder. The VE concluded that such a worker could not find any competitive work, but considering that there is no evidence that Slaughter suffers from such extreme limitations, the entire inquiry is irrelevant.

the limitations in my RFC conclusion," the ALJ reasonably concluded that the VE "did identify occupations that exist in significant numbers that the hypothetical worker [like Slaughter] could perform and sustain." AR 296.

Slaughter has failed to establish that the record contains any conflict between the VE's testimony and the DOT. He alleges that portions of the VE's testimony regarding the types of industry jobs he could perform were inconsistent with the descriptions of those jobs in the DOT.[22] Specifically, Slaughter argues that his condition precludes him from working at ten of the sixteen jobs recited by the VE, thus rendering the VE's testimony unreliable. The court's review of the VE's testimony and the DOT, however, does not reveal any material inconsistencies between the job titles the VE provided and their corresponding DOT descriptions.

Moreover, it is ultimately a moot point whether any discrepancies existed between the VE's testimony and the DOT because the ALJ had no duty to investigate the purported inconsistencies between the two—an allegation that Slaughter raises for the first time on appeal. The VE testified that his testimony was consistent with the DOT, and at no point during the May 1, 2007 hearing did claimant's representative call into question the VE's testimony on this point. Slaughter cannot point to anything in the transcript of the hearing that would indicate to the ALJ any *apparent* conflict between the VE's testimony and the DOT. This is all the more significant given that the VE was questioned aggressively by Slaughter's representative during the hearing. *See* AR 641-47. By obtaining and relying upon the VE's uncontradicted testimony, the ALJ satisfied her duty under Social Security Ruling 00-4p to assure that VE testimony is consistent with the DOT. *Overman*, 546 F.3d at 462-63. The evidence presented at the hearing

---

[22] The VE identified jobs that claimant could perform by each job's nine-digit DOT occupational code.

gave no indication of any obvious conflicts, and thus the ALJ's narrow duty to investigate only *apparent* conflicts was not triggered.[23] *See id.*

In sum, the VE's testimony at the hearing was not contradicted, and no grounds exist for questioning the reliability of his testimony. Thus, the Commissioner satisfied his burden at step five of the sequential evaluation by "establishing that claimant can perform other work that 'exists in significant numbers in the national economy.'" *Overman*, 546 F.3d at 464 (quoting 20 C.F.R. § 404.1560(c)(2)); *see also Britton* v. *Astrue*, 521 F.3d 799, 803 (7th Cir. 2008) (noting that a VE's testimony satisfies the step-five burden only if that testimony is reliable). Based on the foregoing analysis, the court concludes that the ALJ's ruling finding claimant James Slaughter 'not disabled' was supported by "substantial evidence in the record as a whole." *Walker*, 834 F.2d 640.

## CONCLUSION AND ORDER

For the foregoing reasons, Slaughter's motion for summary judgment [#22-1] is denied, and the Commissioner's cross-motion [#32] is granted. Slaughter has failed to establish that he was disabled prior to December 31, 2002 (his date last insured), and thus he does not qualify for Title II Social Security benefits. He has also failed to establish that he was disabled at any time since 2003, and thus he does not qualify for supplemental security income under Title XVI of the Act. The clerk is instructed to enter judgment in favor of the defendant. This case is terminated.

---

[23] Since the ALJ's duty to investigate is triggered based upon record evidence and testimony at the hearing, Slaughter's parsing of the occupational codes in his brief does little to bolster his argument. Surely, the ALJ cannot be expected to scrutinize and cross-check each code to make sure the VE accurately represents the descriptions as they appear in the DOT. Such painstaking inquiry would be impracticable, and it would make the VE's testimony repetitive and unnecessary. In sum, even if such a discrepancy existed here, the conflict was not *apparent*. Slaughter does not point to anything in the record that would have given the ALJ any inkling of a conflict between the VE's testimony and the DOT.

Dated:  November 5, 2010          Enter:  _____
                                          JOAN HUMPHREY LEFKOW
                                          United States District Judge